Charles S. LiMandri, SBN 110841
Paul M. Jonna, SBN 265389
Jeffrey M. Trissell, SBN 292480
LiMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, California  92067
Telephone: (858) 759-9930
Facsimile:  (858) 759-9938
cslimandri@limandri.com

Attorneys for Defendants and
Counterclaimants A&B Market
Plus, Inc., dba Campus Liquor and
Deli; LS&SLG, Inc., dba Adams
Avenue Liquor; Wall First Venture,
Inc., dba RJ Liquor; and OB Star,
Inc., dba Litickers Liquor

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES LIABILITY INSURANCE COMPANY, <br><br> Plaintiff <br><br> v. <br><br> A&B MARKET PLUS INC. dba CAMPUS LIQUOR AND DELI; LS&SLG, INC. dba ADAMS AVENUE LIQUOR; WALL FIRST VENTURE INC. dba RJ LIQUOR, OB STAR INC. dba LITICKERS LIQUOR; SAEED SOMO dba MESA FOOD AND LIQUOR; LATIF MAROGY dba | Case No.: 3:19-cv-00172-GPC-AGS <br><br> **IMAGED FILE** <br><br> **MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF A&B MARKET, LS&SLG, WALL FIRST, AND OB STAR'S JOINT CROSS-MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO USLIC'S CROSS-MOTION FOR SUMMARY JUDGMENT, AS TO THE COMPLAINT; AND** |

| | |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6 | SPOTTS LIQUOR and dba SUNRISE MARKET AND GAS; HANI SHAMOUN dba MIKE'S MARKET; NEIGHBORHOOD MARKET ASSOCIATION, INC.,<br><br>Defendants | **MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE COUNTERCLAIM**<br><br>**Judge:** Gonzalo P. Curiel<br>**Mag. Judge:** Andrew G. Schopler<br>**Courtroom:** 2D<br>**Hearing Date:** May 17, 2019, 1:30 p.m. |

1  SPOTTS LIQUOR and dba SUNRISE

2  MARKET AND GAS; HANI

3  SHAMOUN dba MIKE'S MARKET;

   NEIGHBORHOOD MARKET

4  ASSOCIATION, INC.,

5           Defendants

6

7  A&B MARKET PLUS INC. dba

8  CAMPUS LIQUOR AND DELI, a

9  California corporation; LS&SLG, INC. dba ADAMS AVENUE LIQUOR, a

10  California corporation; WALL FIRST

11  VENTURE INC. dba RJ LIQUOR, a

   California corporation; and OB STAR

12  INC. dba LITICKERS LIQUOR, a

13  California corporation;

14           Counterclaimants,

15

16  v.

17  UNITED STATES LIABILITY

18  INSURANCE COMPANY, a

   Pennsylvania corporation; and DOES 1

19  through 10, Inclusive,

20

21           Counterdefendants.

22

23

24

25

26

27

28

**MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE COUNTERCLAIM**

**Judge:** Gonzalo P. Curiel
**Mag. Judge:** Andrew G. Schopler
**Courtroom:** 2D
**Hearing Date:** May 17, 2019, 1:30 p.m.

**Oral Argument Requested**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................1

FACTUAL BACKGROUND ..........................................................1

1.    Overview of the Underlying Derivative Action ....................1

2.    Background on the USLIC Policy ..................................... 2

3.    Historical Background of the NMA ................................. 2

4.    History of Bad Acts Leading up to the Underlying
Derivative Action...............................................................3

5.    Ramp up to the Underlying Derivative Action ................... 6

6.    Timeline of the Underlying Derivative Litigation ..............7

7.    Negotiations with USLIC ................................................ 9

LEGAL STANDARD ............................................................... 11

LEGAL ARGUMENT ............................................................... 11

1.    In this Context, "Damages" Includes all Financial
Liabilities, Including Liability for Attorneys' Fees. ...........12

     1.1.    Insurance Policies Are Interpreted in Favor of the
Insured....................................................................12

     1.2.    A Layman Defines "Damages" to Include "Costs"
and "Expenses" ...................................................... 13

     1.3.    Attorneys' Fees are "Damages" When the
Underlying Claim is Covered................................... 15

     1.4.    Coverage for a Derivative Action Includes Coverage
for Attorneys' Fees................................................. 17

     1.5.    The Lack of a Definition for "Damages" is an
Ambiguity .............................................................. 19

i

# TABLE OF CONTENTS—Continued

Page

2.    Response to USLIC's Three Affirmative Arguments ........................21

      2.1.    Statutory Definitions are Inapplicable. ....................................21

      2.2.    Cases with Disparate Factual Situations are
              Inapplicable.............................................................................. 22

      2.3.    Cases Interpreting CGL Policies are Inapplicable. ................. 24

CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

Page

CASES:

*APL Co. Pte. v. Valley Forge Ins. Co.,* ..........................................................16, 22, 23
    754 F. Supp. 2d 1084 (N.D. Cal. 2010)

*APL Co. Pte. v. Valley Forge Ins. Co.,* ..................................................................16, 22
    541 F. App'x 770 (9th Cir. 2013)

*Baker v. Pratt,* ......................................................................................................18
    176 Cal. App. 3d 370 (1986)

*Big 5 Corp. v. Gulf Underwriters Ins. Co.,* ..............................................................16
    No. CV 02-3320WJR(SHX), 2003 WL 22127029 (C.D. Cal. July 14, 2003)

*Big 5 Corp. v. Gulf Underwriters Ins. Co.,* ..............................................................16
    136 F. App'x 996 (9th Cir. 2005)

*Brandt v. Superior Court,* ......................................................................................22
    37 Cal. 3d 813 (1985)

*Braude v. Auto. Club of S. Cal.,* ............................................................................18
    178 Cal. App. 3d 994 (1986)

*California Dairies Inc. v. RSUI Indem. Co.,* ........................................................13, 21
    617 F. Supp. 2d 1023 (E.D. Cal. 2009)

*Celotex Corp. v. Catrett,* ........................................................................................11
    477 U.S. 317 (1986)

*City of Pomona v. Employers' Surplus Lines Ins. Co.,* ..............................................20
    5 Cal. Rptr. 2d 910 (1992)

*City of Ypsilanti v. Appalachian Ins. Co.,* ..............................................................20
    547 F. Supp. 823 (E.D. Mich. 1982)

*City of Ypsilanti v. Appalachian Ins. Co.,* ..............................................................20
    725 F.2d 682 (6th Cir. 1983)

iii

# TABLE OF AUTHORITIES—Continued

Page

*Coast Mut. Bldg.-Loan Ass'n v. Sec. Title Ins. & Guarantee Co.*, .................................. 12
  14 Cal. App. 2d 225 (1936)

*Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dep't*, .................................. 20
  387 F. Supp. 2d 1084 (N.D. Cal. 2005)

*Cooper v. Certain Underwriters at Lloyd's, London*, .................................. 14
  716 F. App'x 735 (9th Cir. 2018)

*Crane v. State Farm Fire & Cas. Co.*, .................................. 25
  5 Cal. 3d 112 (1971)

*Cutler-Orosi Unified Sch. Dist. v. Tulare Cty. Sch. etc. Auth.*, .................................. 22, 23
  31 Cal. App. 4th 617 (1994)

*Cziraki v. Thunder Cats, Inc.*, .................................. 18
  111 Cal. App. 4th 552 (2003)

*Golden Eagle Ins. Co. v. Ins. Co. of the W.*, .................................. 16, 19, 23
  99 Cal. App. 4th 837 (4th Dist., Div. 1, 2002)

*Gray v. Zurich Ins. Co.*, .................................. 12, 13, 17, 18, 24, 25
  65 Cal. 2d 263 (1966)

*Health Net, Inc. v. RLI Ins. Co.*, .................................. 15, 16, 23
  206 Cal. App. 4th 232 (2012)

*Hughes v. Mid-Century Ins. Co.*, .................................. 19, 20
  38 Cal. App. 4th 1176 (1995)

*Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, .................................. 15, 16
  944 F.2d 940 (D.C. Cir. 1991)

*Ins. Co. of N. Am. v. Nat'l Am. Ins. Co.*, .................................. 25
  37 Cal. App. 4th 195 (1995)

*Ins. Co. of Penn. v. City Of Long Beach*, .................................. 15, 16, 20, 21, 23
  342 F. App'x 274 (9th Cir. 2009)

1

# TABLE OF AUTHORITIES—Continued

2

Page

3  *Kaplan v. Rand*, ................................................................................................17
4     192 F.3d 60 (2d Cir. 1999)

5  *Kwan v. SanMedica Int'l*, .....................................................................................12
6     854 F.3d 1088 (9th Cir. 2017)

7  *Lunsford v. Am. Guarantee & Liab. Ins. Co.*, ...........................................13, 21
8     18 F.3d 653 (9th Cir. 1994)

9  *MacKinnon v. Truck Ins. Exch.*, .............................................................13, 15, 25
10     31 Cal. 4th 635 (2003)

11  *Nat'l Cas. Co. v. Coastal Dev. Servs. Found.*, ....................................15, 16, 23
12     171 F. App'x 680 (9th Cir. 2006)

13  *Navigators Specialty Ins. Co. v. Moorefield Constr., Inc.*, ............................25
14     6 Cal. App. 5th 1258 (2016)

15  *Nordstrom, Inc. v. Chubb & Son, Inc.*, ..................................................................19
16     54 F.3d 1424 (9th Cir. 1995)

17  *Oasis W. Realty, LLC v. Goldman*, ...........................................................................11
18     51 Cal. 4th 811 (2011)

19  *Prentice v. N. Am. Title Guar. Corp., Alameda Div.*, ....................................22
20     59 Cal. 2d 618 (1963)

21  *Prichard v. Liberty Mut. Ins. Co.*, .......................................................................25
22     84 Cal. App. 4th 890 (2000)

23  *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, ...........................................13
24     41 Cal. 3d 903 (1986)

25  *Renick v. Dun & Bradstreet Receivable Mgmt. Servs.*, ....................................20
26     290 F.3d 1055 (9th Cir. 2002)

27  *Safeway Stores, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, ...18, 19, 23
28     64 F.3d 1282 (9th Cir. 1995)

1

# TABLE OF AUTHORITIES—Continued

2

Page

3  *Save El Toro Assn. v. Days*, ................................................................. 18
4      98 Cal. App. 3d 544 (1979)

5  *Screen Actors Guild Inc. v. Fed. Ins. Co.*, .......................................... 15
6      957 F. Supp. 2d 1157 (C.D. Cal. 2013)

7  *Screen Actors Guild-Am. Fed'n of Television & Radio Artists v. Fed. Ins. Co.*, .............. 15
8      636 F. App'x 409 (9th Cir. 2016)

9  *Travelers Prop. Cas. Co. of Am. v. KFx Med. Corp.*, ......................... 23
10      637 F. App'x 989 (9th Cir. 2016)

11  *UnitedHealth Grp. Inc. v. Hiscox Dedicated Corp. Member Ltd.*, ....... 14
12      No. 09-CV-0210 (PJS/SRN), 2010 WL 550991 (D. Minn. Feb. 9, 2010)

13  *Wallace H. Campbell & Co. v. Maryland Comm'n on Human Relations*, ............ 14
14      202 Md. App. 650 (2011)

15  *Waller v. Truck Ins. Exch., Inc.*, ....................................................... 15
16      11 Cal. 4th 1 (1995)

17  *XL Specialty Ins. Co. v. Loral Space & Commc'n, Inc.*, ............... 14, 19
18      918 N.Y.S.2d 57 (2011)

19

20  STATUTES & RULES

21  Cal. Civ. Proc. Code § 1033.5 ....................................................... 21, 22

22  Cal. Corp. Code § 7341 ...................................................................... 2

23  Cal. Corp. Code § 8334 ...................................................................... 3

24  Cal. R. Court 8.1115 ......................................................................... 20

25  FED. R. CIV. P. 56(c) .......................................................................... 11

26  Ninth Circuit Rule 36–3 ..................................................................... 20

27

28

1

## TABLE OF AUTHORITIES—Continued

2

Page

3   OTHER AUTHORITIES

4   2 H. WALTER CROSKEY, ET AL., RUTTER GRP. PRAC. GUIDE: INS.
5       LITIG. (2018) .................................................................................... 24

6   Anthony P. Tatum & Shelby S. Guilbert, Jr., *Securing D&O For*
7       *Attorneys' Fees in Securities Cases*, LAW360 (May 28, 2013) ................ 21

8   *Damage*, DICTIONARY.COM,
9       https://www.dictionary.com/browse/damage (last
10      visited Mar. 6, 2019) ......................................................................... 14

11  *Damage*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (12th
12      ed. 2014) ............................................................................................. 13

13  *Damage*, RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY
14      (2d ed. 1997) .................................................................................. 13, 14

15  *Damage*, WIKTIONARY, https://en.wiktionary.org/wiki/damage
16      (last edited Mar. 15, 2019) ................................................................. 14

17  William G. Passannante & Vivian C. Michael, *Attorney Fees and*
        *Liability Insurance: Recovering Fees Paid to Plaintiffs and*
18      *Fees Incurred by Policyholders*, WESTLAW J. INS. COVERAGE,
19      Feb. 27, 2015 ..................................................................................... 21

20

21

22

23

24

25

26

27

28

# INTRODUCTION

There is a single legal issue presented by these cross-motions for summary judgment: whether the Neighborhood Market Association's ("NMA") liability to four of its members—for their attorneys' fees incurred in a derivative action on its behalf—is covered by an insurance policy issued to the NMA. A review of the policy itself, and the applicable case law, answers that question unequivocally in the affirmative.

# FACTUAL BACKGROUND

## 1. Overview of the Underlying Derivative Action[1]

On September 24, 2015, Defendants and Counterclaimants A&B, LS&SLG, Wall First, and OB Star ("the Members"), as members of the Neighborhood Market Association ("NMA"), commenced a derivative action on behalf of the NMA against its President, Mark Arabo, and against a single board member. The NMA is a non-profit mutual benefit corporation that serves as a trade association for independent retail convenience stores. The Members are variously headed by Mr. Arkan Somo (A&B), Mr. Samir Salem (LS&SLG and Wall First), and Mr. Basil Zetouna (OB Star). The underlying derivative action was captioned *A&B Market Plus, Inc., et al., v. Neighborhood Market Association, Inc., et al.*, San Diego Superior Court Case No. 37-2015-00032389-CU-OE-CTL (the "underlying derivative action"). The action was assigned to the Hon. Richard E.L. Strauss.

The operative complaint in the underlying derivative action alleged both derivative and direct causes of action. The derivative causes of action focused on misconduct that occurred between 2013 and 2015, when the NMA lost over $1,600,000. These claims focused on improper payments to Mark Arabo, including a bonus/commission of $210,000; an "expense reimbursement" of $38,000; and a series of additional personal

---

[1] Exhibits A through L are attached to the LiMandri declaration. The facts in sections 1, and 3 through 6, are taken from the statement of decision (Ex. B) issued in the underlying action. The facts in section 2 come from the Rubin declaration; the facts in section 7 come from the LiMandri declaration.

payments to Arabo using NMA funds (while coding them as business expenses). The direct causes of action sought injunctive relief against the NMA: (1) to address its failure to provide the Members with full inspection rights of the minutes, records, financial accounts, and membership list of the NMA—in violation of the NMA's Bylaws and California law, and (2) to address the NMA's attempt to retaliate against A&B by purporting to remove it as a NMA member, in violation of Cal. Corp. Code § 7341.

**2.    Background on the USLIC Policy**

On or about March 11, 2015, United States Liability Insurance Company ("USLIC") issued to the NMA a Directors and Officers Liability policy, no. NDO1040726L, which was in effect for the period of March 11, 2015, through March 11, 2016 (the "Policy"). Thus, it was the operative policy when the underlying derivative action was commenced. Under the terms of the Policy, USLIC agreed to indemnify the NMA up to the amount of $1,000,000 for all "Loss" "that the Insured shall become legally obligated to pay" "for Wrongful Acts arising out of an Insured's duties on behalf of the Organization." Policy § I.A. The Policy also expressly covered derivative actions. Policy § IV.G(1). On or around September 24, 2015, the NMA was served with the complaint in the underlying derivative action, and tendered its defense to USLIC. Soon thereafter, USLIC acknowledged that its Policy covered the underlying derivative action, and agreed to provide the NMA with a defense.

**3.    Historical Background of the NMA**

The Members' principals and the individual defendants in the underlying derivative action, including most of the NMA's directors, are all part of the Chaldean Catholic community in San Diego County, California. Mark Arabo was hired by the NMA in 2006 to work in marketing when the organization was headed by his brother. After working at the NMA for approximately two years, Arabo was made NMA President and CEO in 2008 when his brother left the organization. Then, in mid-2010, the NMA board approved an extension of Arabo's employment contract. Substantially the same contract was again extended in 2012 with increased compensation. The 2012

contract was operative during most of the period in contention. Both extensions were ratified years before the previous employment agreement was set to expire.

The 2010 election of the NMA's 2011–2012 board of directors resulted in Mr. Salem and Mr. Zetouna losing seats as directors. Based on the results in previous elections and the general esteem with which they were held in the community, their poor election performance led them to question both the vote counting and campaigning method. It was later discovered that during the pendency of the last several NMA elections, some campaigners visited member stores urging votes for a specific slate of candidates. This campaigning tactic necessarily relied on access to the membership list which was inaccessible to the other candidates. Thus, in early 2011, Mr. Salem asked numerous questions about the election and requested the NMA's membership list under the NMA's Bylaws and California law. Mr. Salem's 2011 requests were denied but dialogue with the organization continued. The NMA membership list was controlled by Arabo and stored securely in his office during his time as President and CEO.

## 4.   History of Bad Acts Leading up to the Underlying Derivative Action

Sometime after the 2010 election, substantial changes to the practical conduct of the NMA board of directors occurred, including a reduction in the amount of financial information to which the board had access.

*First*, in late 2012, a prior executive Secretary/Treasurer of the NMA, Nashat Damman, resigned in protest when he was not given access to the organization's full financial records, in violation of Cal. Corp. Code § 8334, and was denied the ability to exercise any oversight of its funds by Arabo. Arabo responded to Damman's email resignation with a series of ad hominem attacks on Damman's character and conduct as an NMA member. Following his resignation, Damman was pressured by members of the NMA board of directors and threatened with a lawsuit unless he apologized for the manner of his resignation, which he ultimately and reluctantly did.

*Second*, beginning in 2011, the NMA began to pay large sums of money to independent contractor Jesus Cardenas and several businesses and fictitious business

names controlled by him (collectively, the "Cardenas entities"). At the end of 2011, the NMA's Vice President, Samantha Dabish (a licensed attorney), resigned and some of her prior duties shifted to Cardenas. The NMA also gradually phased out its former lobbying firm before fully terminating the relationship and replacing them with the Cardenas entities. Payments to Cardenas totaled approximately $600,000 for 2013 and 2014, two years in which the NMA suffered operating losses of over $1 million and which were offset only by the sale of their building. Invoices from the Cardenas entities were vague and regularly billed thousands of dollars per month for "consulting" and similarly nondescript services. A subpoena of Cardenas' bank records uncovered numerous checks written by Jesus Cardenas and his organizations to Arabo, Board Member Oram, Arabo's wife, and Chairman Attisha after they had denied such connections in sworn statements.

*Third*, the NMA was related to a separate 501(c)(3) called the Neighborhood Market Association Education Foundation ("Education Foundation"). In 2010, the Education Foundation received a $100,000 donation from San Diego Padres owner Ron Fowler to be used for education and scholarships. However, Arabo considered the money part of the NMA general fund. A $75,000 transfer from the Education Foundation was made as a "gift" to the NMA in 2012 to assist with the purchase of an office building on Friars Road in Fashion Valley. Most of the remaining funds in the Education Foundation's bank account were spent through a $23,258 check written to Sheraton San Diego in February 2013, in a transaction related to the NMA's annual banquet. Arabo ultimately argued that the Education Foundation used the funds to purchase from the NMA the right to name a room in the NMA office building.

*Fourth*, the NMA Bylaws explicitly required that the executive board of directors meet three times a year, once per trimester. In 2013, only two board meetings took place, the second on December 27, 2013. The next year, the board met only one time— on October 2, 2014. This meeting was split up into three sessions (which were supposed to be separate meetings) in order to comply with the Bylaws.

*Fifth*, at its December 2013 meeting, the NMA board was informed that the NMA had raised $350,000 for San Diego mayoral candidate Nathan Fletcher. Since the Board had not met since February, and former Mayor Filner did not resign until August, this meant that Arabo acting alone had chosen to raise the money. It was also discovered that Arabo donated $100,000 of the NMA's funds to Fletcher's campaign, without informing the board.

*Sixth*, in late 2013, the NMA members (including the Members here), were told by the NMA that it was in such a difficult financial situation that it was necessary to sell their only asset, the office building on Friars Road which was returning positive net rental income. As a result, at some point, the NMA Board decided to sell the NMA's office building located on Friars Road at Fashion Valley. The first offer came from Keller Williams SD Central Coastal, who offered $2.6 million for the building. A competing offer from Mission Hills Development then came in for $3.32 million, which Keller Williams decided to match. After the sale of the NMA's Friars Road building was completed in 2014, a large portion of the net profit from the sale was disbursed to Arabo at the next board meeting. Arabo requested that broker Mike Habib write a letter of recommendation on Arabo's behalf. Mike Habib produced a glowing letter ascribing to Arabo remarkable powers of persuasion and falsely crediting him with negotiating the price from $2.1 to $3.32 million. As a result, on October 2, 2014, the Board awarded Arabo a $210,000 bonus—ten percent of the original sale price.

*Seventh*, throughout 2014, Arabo travelled on multiple occasions to New York and Washington, D.C. to lobby for lifting immigration restrictions and extending humanitarian aid to Iraqi Christian refugees displaced by ISIS. These travel expenses and related Facebook advertising expenses from Arabo's efforts to promote this cause were charged to the NMA American Express card and totaled approximately $38,000. However, despite not paying for them himself, Arabo requested that the NMA board reimburse him for the expenses, which it did at the October 2, 2014, board meeting.

Although the Members had heard rumors of bad acts for some time, and odd

behavior and dealings by Arabo, it was upon learning of the 2014 bonuses and "reimbursement" to Arabo totaling $248,000 that the Members decided to retain an attorney and formally request inspection of the organization's finances under its Bylaws and Cal. Corp. Code § 8333.

**5.    Ramp up to the Underlying Derivative Action**

The Members' first attorney wrote to Arabo in February 2015, requesting access to various NMA records, including financial records, meeting minutes, and the membership list. All of the items identified were items which members are entitled to review. The NMA's attorney, Nathan Kased, replied via email denying access to the requested records and falsely defaming Mr. Somo. This was the same pattern of ad hominem attacks in response to requests for information that Arabo used against Mr. Damman. Kased offered that the NMA would distribute to all members any correspondence that the Members wished to submit to them. Kased also agreed to make some of the requested financial records available for inspection, but he denied others on the basis that they were "not reasonably related to Mr. Somo's membership interest."

The Members then retained attorney Norman Grissom, who sent the NMA a formal demand letter and draft complaint on June 1, 2015. In his letter, Attorney Grissom also accepted the prior offer of inspection of some of the records requested by his predecessor and reasserted the Members' right to the rest of the information. Attorney Kased's firm replied to Grissom on June 5, 2015, insisting, among other things, that the NMA was "not legally permitted" to provide Mr. Somo with access to the membership list because A&B Market had allowed its membership to lapse by not paying its dues by January 1. Attached to that reply was a letter that had allegedly been sent to Mr. Somo on April 8, 2015, notifying it of its alleged delinquency in paying dues. However, later evidence indicated that the delinquency letter was fabricated. Judge Strauss in the underlying action also found that numerous members actually paid their dues in June of each year—not January.

In September 2015, Attorney Grissom sent additional demand letters to Arabo

and the NMA, informing them of additional NMA members who demanded access to the same information that A&B had requested in June. The Members then filed their complaint on September 23, 2015.

**6.      Timeline of the Underlying Derivative Litigation**

In August 2015, immediately after receiving the Members' demand letter and draft complaint, the NMA approved a contract with a new company, Refined Management, Inc. (RMI). RMI was essentially a shell run by Arabo through which he could run the NMA with less oversight from the NMA board. Under the contract, the NMA was obligated to pay RMI $44,000 per month in 2017 and $46,000 per month in 2018—bleeding the NMA of its resources.

In the next year, the parties engaged in numerous discovery disputes. This resulted in multiple motions filed in August 2016. The Members filed a motion to compel the NMA to produce its financial records, and the NMA filed a motion to quash the Members' subpoena to the NMA's bank, Wells Fargo. The Members were successful in both motions. With respect to the motion to compel, Judge Strauss also sanctioned the NMA in the amount of $5,938, chastising it for "dilatory tactics" and stating that its "lack of responses and voluminous objections exhibit evasiveness, and evidence a lack of good faith in answering discovery."

Nevertheless, the bad acts continued. On November 8, 2016, NMA board member Nashwan Habib, elected for the 2015-2016 term, entered a local Chase Bank branch and withdrew $10,000 from Attorney Grissom's firm business checking account. Despite being highly unusual, this was explained by bank management as a mistake because the account numbers shared some similarity.

Then, in February 2017, Attorney Grissom contacted former NMA employee Fr. Daniel Shaba (then a seminarian studying with the Chaldean Catholic Church) to discuss testifying at trial. Fr. Shaba then signed a declaration summarizing his role as an employee of the NMA and his relationship with Arabo during that time. Then, on March 27, 2017, two NMA board members each telephoned Fr. Shaba. He called one back (Mr.

Bashar Ballo), who then criticized him for getting involved in the lawsuit, and asked him to retract the statements he had made (referring to his declaration). Ballo also warned him that, by becoming involved, he might get sued. Fr. Shaba then summarized his call with Ballo in a second declaration, and characterized it as threatening. Then, in or around early April 2017, Bishop Warduni of the local Chaldean Catholic Church, received a package hand delivered by Joseph Shammam—Arabo's cousin and employee. That package contained several photos of Fr. Shaba, one of which was of an extremely embarrassing nature taken many years earlier when he was in college.

Because of the bank intrusion and the intimidation of Fr. Shaba, on April 25, 2017, Judge Strauss granted the Members a trial continuance and allowed them to pursue additional discovery, including a further deposition of Arabo. Instead of backing down, on June 23, 2017, Attorney Grissom's firm bank account was accessed without authorization a second time, apparently by the same person. At trial, the Chase bank branch manager testified that it would be rare for an account to be mistakenly accessed once, and he had never heard of one being mistakenly accessed twice.

On July 18, 2017, because of the difficulty in scheduling times for the numerous depositions, Judge Strauss granted an additional trial continuance. In addition to voluminous written discovery, over 30 individuals were deposed over 40 separate sessions. Another trial continuance was later granted on September 5, 2017. Trial ultimately began on October 10, 2017. The difficulty in pushing the litigation forward is evidenced by the fact that the NMA and Arabo raised the issue of derivative standing five separate times: in a demurrer, a motion for judgment on the pleadings, motions in limine, a motion for nonsuit, and at closing argument. At all stages, Judge Strauss found that the Members had standing to bring the derivative action.

Judge Strauss ultimately entered judgment in the Members' favor. At the end of closing argument, Judge Strauss announced his ruling from the bench, and stated that: "This is one of the most unusual cases I've had in my 22 years on the bench. I've never heard so much fiction under oath. It's really unbelievable." The court then pointed to

several people whose testimony he found incredible, and specifically called out Arabo with respect to the hoops he made the Members jump through to authenticate his handwriting:

> Your testimony, Mr. Arabo, is also incredible. To sit here on this stand and tell me you can't tell if that's your own handwriting when even I could tell by looking at the—the birthday card and then the copy of the driver's license. They're identical. And then when faced with a concept that they're taking your handwriting exemplars and they're going to give them to an expert, then all of a sudden you go home and you look at it further and come to a realization that probably is your handwriting. You could tell right here. And to try to say that you can't recognize your own handwriting is very difficult for me to believe. And I don't believe.

*See* LiMandri Decl., Ex. A, Oral Ruling.

Judgment was originally entered on January 18, 2018. However, it was amended several times. The operative second amended judgment ultimately stated that: (1) Arabo was required to pay damages in the amount of $248,000 to the NMA; (2) A&B must be reinstated as an NMA member; (3) all NMA members must be granted access to the NMA's financial records and membership list; (4) a Receiver must be appointed to hold a new election; and (5) the Members were determined to be the prevailing parties entitled to litigation costs recoverable from Arabo and/or the NMA in the amount $98,426.58, and attorneys' fees recoverable from the NMA only in the amount of $1,150,866.50. *See* LiMandri Decl., Ex. D. Following the new election, only Mr. Salem was elected to the board of directors. The board then hired Mr. Somo as the President of the NMA. Both he and Mr. Salem recuse themselves from all discussions regarding the underlying derivative action.

**7.     Negotiations with USLIC**

As stated above, Judge Strauss entered judgment in the Member's favor, naming them prevailing parties, on January 18, 2018. At that time, however, Judge Strauss had not yet adjudicated the amount of litigation costs and attorneys' fees to which they were entitled. First, in February 2018, the NMA and Arabo each moved to tax the

1   Members' costs. Then, in March 2018, the Members filed their motion for attorneys'
2   fees. Unfortunately, the costs and fees motions were not set for hearing for several
3   months, and ended up requiring multiple hearings and multiple rounds of briefing. In
4   June 2018, Judge Strauss granted the Members a costs award of approximately
5   $100,000, but the fees motion remained pending.

6        On August 10, 2018, the Members made a demand for settlement of the
7   underlying derivative action in the amount of the USLIC Policy limits of $1,000,000.
8   That same day, the NMA agreed to the settlement, but USLIC refused to consent to
9   it—or any amount. Instead, USLIC contended that liability for litigation costs and
10  attorneys' fees were not "losses" covered by the Policy. It further contended that it
11  could not settle with the Members on behalf of the NMA for the Policy limits because
12  doing so would exhaust its Policy limits, precluding it from continuing to defend Arabo
13  in any appeal. In response, on August 21, 2018, counsel for the Members sent an email
14  to counsel for USLIC, offering to settle for $972,500, but received no response.
15  Counsel also indicated that "it would be bad faith for USLI to reject this offer to settle
16  on behalf of the NMA for $972,500.00, when its actual exposure to an adverse
17  judgment at this point more closely approximates $1,250,000."

18       On September 28, 2018, Judge Strauss ruled on the Members' motion for
19  attorneys' fees, and granted them an award of fees against the NMA in the amount of
20  $1,150,866.50. The litigation costs were ultimately paid by Arabo alone, so only the
21  attorneys' fees are outstanding. They are accruing interest at a daily rate of $315.31.
22  To the date of this filing, the total liability is $1,286,763.34.

23       On November 16, 2018, the NMA assigned to the Members its contractual right
24  to recover from USLIC the funds needed to satisfy the judgment entered in the
25  underlying derivative action, and the Members began preparing to initiate an action for
26  breach of contract and breach of the covenant of good faith and fair dealing. However,
27  on January 25, 2019, USLIC initiated the present action for declaratory relief instead,
28  to which the Members counterclaimed on February 15, 2019.

# LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law." FED. R. CIV. P. 56(c). "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

# LEGAL ARGUMENT

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). Through this motion, the Members seek summary judgment with respect to their breach of contract claim. The Members also seek summary judgment with respect to both their and USLIC's claims for declaratory relief, both of which seek adjudication of the parties' rights and responsibilities under that contract.

Here, it is undisputed that there is a contract—the Policy. It is undisputed that the NMA performed under that contract (and assigned its rights to the Members). It is also undisputed that the Members have suffered damage in not being paid the Policy limits of the contract. The *sole* element at issue is whether USLIC has breached the contract by not paying the Policy limits. That element, in turn, revolves around a single question: whether the NMA's liability for the Members' attorneys' fees, which were incurred in the underlying derivative action, is covered by the Policy issued to the NMA by USLIC. If so, USLIC has breached the contract—if not, it has not.

The Policy states that "[t]he **Company** will pay on behalf of the **Insured Loss** . . . that the **Insured** shall become legally obligated to pay. . . ." Policy § I.A (original bolding). Bolded terms are defined. The "Company" is USLIC; the "Insured" is the

NMA; and "Loss" "means *damages*, settlements, pre-judgment and post judgment interest awarded by a court and punitive or exemplary damages to the extent such damages are insurable under applicable law, but does not include fines, penalties, taxes, the multiplied portion of any multiple damage award, and other monetary sanctions that are uninsurable by operation of law." Policy § III.I (italics added). USLIC's argument is that the definition of "Loss" recited above does not include the term "costs," and attorneys' fees are "costs" *not* "damages." The problem with USLIC's argument is simply that, under the applicable case law, attorneys' fees *are* "damages."

**1.    In this Context, "Damages" Includes all Financial Liabilities, Including Liability for Attorneys' Fees.**

### 1.1.    Insurance Policies Are Interpreted in Favor of the Insured

When interpreting an insurance contract, the California Supreme Court[2] has "time and again" "long applied the doctrine of reasonable expectation," construing the policy to provide the protection the insured reasonably had the right to expect. "Not only the provisions of the [insurance] policy as a whole, but also the exceptions to the liability of the insurer, *must be construed so as to give the insured the protection which he reasonably had a right to expect*, and to that end doubts, ambiguities, and uncertainties arising out of the language used in the policy must be resolved in his favor." *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 271 n.7 (1966) (original italics) (quoting *Coast Mut. Bldg.-Loan Ass'n v. Sec. Title Ins. & Guarantee Co.*, 14 Cal. App. 2d 225, 229 (1936)).

This case law—extending back more than a hundred years—is not stale, but is regularly reaffirmed by the California Supreme Court.

> [A]ny exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect. Thus, the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language.

---

[2] When sitting in diversity, "[f]ederal courts are bound by the pronouncements of the state's highest court on applicable state law." *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1093 (9th Cir. 2017).

> The exclusionary clause must be conspicuous, plain and clear. This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded. The burden is on the insured to establish that the claim is within the basic scope of coverage and on the insurer to establish that the claim is specifically excluded.

*MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003), *as modified on denial of reh'g* (Sept. 17, 2003) (quotation marks and citations omitted).

Thus, to ensure that the insured is given "the protection which he reasonably had a right to expect," *Gray*, 65 Cal. 2d at 271 n.7, "when interpreting policy provisions, undefined terms should be interpreted as *laymen would read them*, not as they might be analyzed by an attorney or insurance expert." *California Dairies Inc. v. RSUI Indem. Co.*, 617 F. Supp. 2d 1023, 1030 n.3 (E.D. Cal. 2009) (italics added). Further, a term in an insurance policy "is ambiguous [where] it is not defined in the policy and [where] a layperson's understanding would differ from the legal definition of the term." *Lunsford v. Am. Guarantee & Liab. Ins. Co.*, 18 F.3d 653, 654 (9th Cir. 1994) (citing *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 41 Cal. 3d 903, 911 (1986)). To determine how a layman would read a term, an "examination of various dictionary definitions of a word will no doubt be useful," but most importantly, a court "must attempt to put itself in the position of a layperson and understand how he or she might reasonably interpret the [] language." *MacKinnon*, 31 Cal. 4th at 649.

**1.2.   A Layman Defines "Damages" to Include "Costs" and "Expenses"**

So how would a layperson read "damages" within the definition of "Loss" in the Policy? Merriam-Webster defines "damage" as 1) "loss or harm resulting from injury to person, property, or reputation," 2) "compensation in money imposed by law for loss or injury," and 3) "**expense, cost.**" *Damage*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (12th ed. 2014) (emphasis added). Very similarly, Random House defines "damage" as 1) "injury or harm that reduces value, usefulness, etc.," 2) "the estimated money equivalent for loss or injury sustained," and 3) "**cost; expense; charge.**" *Damage*,

1    RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY (2d ed. 1997) (emphasis added).

2         Turning to the sources a modern layman would most likely use, Wiktionary
3 defines "damage" as 1) "Injury or harm; the condition or measure of something not
4 being intact," and 2) "**Cost or expense.**" *Damage*, WIKTIONARY,
5 https://en.wiktionary.org/wiki/damage (last edited Mar. 15, 2019) (emphasis
6 added).[3] Dictionary.com in turn is based on the Random House dictionary, and so uses
7 the same definition, which includes "**cost; expense; charge.**" *Damage*,
8 DICTIONARY.COM, https://www.dictionary.com/browse/damage (last visited Mar. 6,
9 2019) (emphasis added). Significantly, each of these definitions includes "expense"
10 and "cost" within them. Without engaging in a rabbit-hole discussion of the
11 definitions of "expense" and "cost," it is sufficient to say that the inclusion of these
12 terms makes a layman's definition of "damages" broader than USLIC's legal
13 definition.

14         Indeed, from the perspective of the losing party, whether attorneys' fees are
15 "costs" or "damages" is absolutely irrelevant—he still has to pay them. Indeed, some
16 insurance polices explicitly define "damages," and when they do so, define them as
17 "any monetary amount . . . which an Insured is legally obligated to pay as a result of a
18 Claim." *UnitedHealth Grp. Inc. v. Hiscox Dedicated Corp. Member Ltd.*, No. 09-CV-
19 0210 (PJS/SRN), 2010 WL 550991, at *6 (D. Minn. Feb. 9, 2010). This tracks a
20 layman's understanding of "damages." Further, relying on *UnitedHealth Group*, New
21 York has held that this expansive definition of "damages" should apply when
22 "damages" is not defined in the insurance policy. *See XL Specialty Ins. Co. v. Loral
23 Space & Commc'n, Inc.*, 918 N.Y.S.2d 57, 62 (2011) ("[T]he attorneys' fees Loral had
24 to pay constitute damages"); *see also Cooper v. Certain Underwriters at Lloyd's, London*,
25 716 F. App'x 735, 736 (9th Cir. 2018) (There are no "material differences between

26

---

27 [3] "Some courts have turned to Wiktionary to determine a popular understanding of the
28 English language rather than a traditional dictionary definition." *Wallace H. Campbell &
Co. v. Maryland Comm'n on Human Relations*, 202 Md. App. 650, 667 n.7 (2011).

1  New York and California in interpreting [] disputed insurance polic[ies].'").

2      **1.3.    Attorneys' Fees are "Damages" When the Underlying Claim is Covered**

3          However, the term "damage" also cannot be examined in a vacuum. As

4  *MacKinnon* notes, a court "must attempt to put itself in the position of a layperson and

5  understand how he or she might reasonably interpret the [] language" of the policy.

6  *MacKinnon*, 31 Cal. 4th at 649. In so doing, the "language in a contract must be

7  interpreted as a whole, and in the circumstances of the case." *Id.* at 648 (quoting *Waller*

8  *v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995), *as modified on denial of reh'g* (Oct. 26,

9  1995)). Thus, the definition of "damage" changes based on the type of insurance policy,

10 and even changes based on the posture of the case. *See, e.g., Nat'l Cas. Co. v. Coastal*

11 *Dev. Servs. Found.*, 171 F. App'x 680, 685 (9th Cir. 2006) ("[A]ttorney's fees and costs

12 are sometimes construed to be damages by California courts."); *Ins. Co. of Penn. v. City*

13 *Of Long Beach*, 342 F. App'x 274, 278 (9th Cir. 2009) ("[C]ases nationwide have

14 differed on whether ['damages'] may include attorney's fees."); *Health Net, Inc. v. RLI*

15 *Ins. Co.*, 206 Cal. App. 4th 232, 257 (2012), *as modified on denial of reh'g* (June 12, 2012).

16         So what is the appropriate definition of "damages" here? The case law is plain:

17 here, "damages" in the Policy includes liability for attorneys' fees. Where the underlying

18 claim itself is not covered by the insurance policy, then attorneys' fees are not "damages"

19 under the policy. This ensures that a policy that excludes actions seeking solely

20 declaratory relief, cannot be invoked merely because the action seeks declaratory relief

21 *and* attorneys' fees. *See Screen Actors Guild Inc. v. Fed. Ins. Co.*, 957 F. Supp. 2d 1157, 1165

22 (C.D. Cal. 2013), *aff'd*, 636 F. App'x 409 (9th Cir. 2016); *cf. also* Policy § III.B ("'Claim'

23 means: . . . Any proceeding . . . [seeking an] order for *money damages*") (bolding omitted;

24 italics added). However, "if a complaint alleges some covered wrongful acts," then "the

25 claim for attorney fees is covered." *Health Net, Inc.*, 206 Cal. App. 4th at 257; *cf. also*

26 Policy § III.I ("'Loss' means *damages*") (bolding omitted; italics added).

27         In such a situation—where the claim is covered and a defense is being

28 provided—there, a "**layperson would expect 'damages' to encompass all financial**

1  **liabilities one is obligated to pay.**" *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*,
2  944 F.2d 940, 945 (D.C. Cir. 1991) (emphasis added) (applying both California and
3  Missouri law because principles are the same, and rejecting technical definition of
4  "damages" which excludes "restitution"). This includes attorneys' fees. *Golden Eagle*
5  *Ins. Co. v. Ins. Co. of the W.*, 99 Cal. App. 4th 837, 851–52 (4th Dist., Div. 1, 2002)
6  (McConnell, P. J.) (distinguishing case law using narrow definition of "damages" to
7  exclude attorneys' fees because they do not concern "the insured's assumption of
8  liability for the indemnitee's costs in defending against covered third party tort
9  actions" and commenting that "[n]otably, the [insurance] bulletin shows that the
10 insurance industry believe[s] that when an insured contract includes the assumption
11 of the indemnitee's attorney fees and costs, such expenses are covered 'damages'
12 according to the reasonable expectations of the insured.").[4]

13      In recognizing this, USLIC states at the very end of its brief that "there were no
14 covered damages, only non-monetary relief claims." Dkt. 14, 14:11–12. Therefore,
15 according to USLIC, even if this Court were to follow the case law laid out above, this
16 case is "[u]nlike *Health Net*" because there was "only non-covered or equitable relief."
17 Dkt. 14, 1:4–7, 14:11–15. "To borrow the language of *Health Net*, Plaintiffs cannot
18 bootstrap coverage for attorney's fees when none of the actual relief awarded was

19 _____

20 [4] *See also Big 5 Corp. v. Gulf Underwriters Ins. Co.*, No. CV 02-3320WJR(SHX), 2003 WL
21 22127029, at *3 (C.D. Cal. July 14, 2003) (noting that in cases that "found the insurer
   liable for attorneys' fees, the courts in those cases also found that the insurance policies
22 covered a part of the underlying claims," and denying fees because the "policy does not
   cover the" underlying claim), *aff'd*, 136 F. App'x 996 (9th Cir. 2005); *Nat'l Cas. Co. v.*
23 *Coastal Dev. Servs. Found.*, 171 F. App'x 680, 686 (9th Cir. 2006) ("[O]ur interpretation
   of the National Policy . . . gives effect to 'the objectively reasonable expectations of the
24 insured,' that all costs taxed against it would be treated as 'DAMAGES' as defined
   when Coastal Development bought its policy.") (citations omitted); *APL Co. Pte. v.*
25 *Valley Forge Ins. Co.*, 754 F. Supp. 2d 1084, 1094 (N.D. Cal. 2010) ("Given [a layman's]
   definition of 'damages,' the attorneys' fees awarded in the underlying litigation falls
26 plainly within the coverage of the policy."), *rev'd on other grounds*, 541 F. App'x 770 (9th
   Cir. 2013); *Ins. Co. of Penn. v. City Of Long Beach*, 342 F. App'x 274, 278 (9th Cir. 2009)
27 ("[B]ecause the word 'damages' is not defined in these policies . . . we interpret the
28 policies in favor of coverage for the attorney's fees as damages.").

1   covered." Dkt. 14, 14:16–18. But, as stated below, the Policy expressly includes coverage

2   for claims seeking "money damages *or other relief*," including specifically "*derivative*

3   *actions*." Policy §§ I.A, III.B, IV.G (italics added). Therefore, this argument fails.

4   **1.4.  Coverage for a Derivative Action Includes Coverage for Attorneys' Fees**

5   In addition, the fact that the Policy explicitly covers derivative actions means that

6   an insured "reasonably ha[s] a right to expect" coverage for attorneys' fees. *Gray*, 65

7   Cal. 2d at 271 n.7. The Policy states generally that: "The Company will pay on behalf of

8   the Insured Loss . . . not exceeding the Limit of Liability for which this Coverage Part

9   applies, that the Insured shall become legally obligated to pay because of **Claims** . . . for

10  Wrongful Acts arising solely out of an Insured's duties on behalf of the Organization."

11  Policy § I.A (some bolding omitted). It then goes on to define "Claim" as including

12  "[a]ny proceeding initiated against the Insured . . . before any governmental body legally

13  authorized to render an enforceable judgment or order for **money damages or other**

14  **relief** against such Insured alleging that the Insured has committed, or is responsible for,

15  a Wrongful Act." Policy § III.B (some bolding omitted). Finally, the Policy goes on to

16  specifically include "any **derivative action** on behalf of, or in the name or right of the

17  Organization, if such action is brought and maintained totally independent of . . . any of

18  the Insureds." Policy § IV.G (original bolding omitted; new bolding added).

19  Derivative actions are by their very nature equitable actions that by definition *do*

20  *not seek* damages payable to the derivative plaintiff, and *do seek* recovery of the derivative

21  plaintiff's attorneys' fees. In such actions, the plaintiff stands in the shoes of the

22  corporation and, on its behalf, sues third-parties such as the corporations' directors. The

23  derivative plaintiff is not seeking damages personally, only relief for the corporation.

24  Then, if the corporation obtains a monetary recovery from a successful derivative suit,

25  the derivative plaintiff is entitled to reimbursement for reasonable legal fees incurred in

26  prosecuting the action. *See Kaplan v. Rand*, 192 F.3d 60, 69 (2d Cir. 1999) ("It has long

27  been the rule that the plaintiffs in such an action may recover attorneys' fees").

28  Such reimbursement is awarded out of the recovery under the equitable

1   "common fund doctrine," i.e., one who brings an action to create or preserve a

2   "common fund" for the benefit of others (e.g., the corporation and its other

3   shareholders) is entitled to be made whole for his or her reasonable and necessary

4   expenses. *Cziraki v. Thunder Cats, Inc.*, 111 Cal. App. 4th 552, 557–58 (2003); *see also*

5   *Baker v. Pratt*, 176 Cal. App. 3d 370, 378 (1986). "The substantial benefit principle

6   extends the common fund doctrine to litigation which has not resulted in a pecuniary

7   recovery but has resulted in substantial benefits to an identifiable class of persons."

8   *Braude v. Auto. Club of S. Cal.*, 178 Cal. App. 3d 994, 1005 (1986). "The substantial

9   benefits, like the common fund theory, rests on the principle that those who have been

10  'unjustly enriched' at another's expense should under some circumstances bear their

11  fair share of the costs entailed in producing the benefits they have obtained." *Id.*

12  (quoting *Save El Toro Assn. v. Days*, 98 Cal. App. 3d 544, 548 (1979)).

13       Here, the Policy explicitly covers "derivative action[s]," regardless of whether

14  they seek "money damages or other relief." Policy §§ III.B, IV.G. If a derivative action

15  seeks only "other relief," then there will be no common fund from which the nominal-

16  defendant corporation can pay the derivative plaintiff's attorneys' fees—and those

17  fees will instead hit it like a ton of bricks. In this context, courts have generally held

18  that the liability for attorneys' fees are a "loss" which should be covered by a D&O

19  policy. Although the corporation may have technically received a substantial benefit,

20  the reality is that "[t]he lawyers got the money, not the shareholders," *Safeway Stores,*

21  *Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 64 F.3d 1282, 1286–87 (9th Cir. 1995),

22  and so the "normal expectation of the extent of coverage of the policy" would include

23  coverage for that loss. *Gray*, 65 Cal. 2d at 271 n.7.

24       Indeed, in *Safeway Stores*—a published Ninth Circuit opinion—the court held that

25  liability for attorneys' fees resulting from a derivative action are covered "losses" in a

26  D&O policy very similar to the one here. *Safeway Stores, Inc.*, 64 F.3d at 1286–89. The

27  only difference was that "loss" was not defined there, and so the court looked to "[t]he

28  plain meaning of the term 'loss.'" *Id.* at 1286 n.8. But regardless of whether "loss" is

defined or not, as including "costs" or not, the court must "consider the particular policy in question to determine which rule best effectuates the reasonable expectations and intentions of the parties under the insurance contract." *Id.* at 1287 (quoting *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1432 (9th Cir. 1995), *as amended on denial of reh'g* (Aug. 1, 1995)). And "[a]s a matter of common sense, protection from potentially ruinous [attorneys' fees] is as vital to an insured as protection from the [insured's] tort liability." *Golden Eagle Ins. Co.*, 99 Cal. App. 4th at 852; *see also XL Specialty Ins. Co.*, 918 N.Y.S.2d at 61–62 ("What the insurers are in essence suggesting is that the attorneys' fees should be offset against the value of the non monetary benefit [the corporation] received as a result of the [derivative action]. But nothing in the policy suggests offsetting a Loss by the amount of any non monetary benefits received."). Therefore, when derivative actions are explicitly covered by an insurance policy, liability for the derivative plaintiff's inevitable attorneys' fees award should be covered.

### 1.5.    The Lack of a Definition for "Damages" is an Ambiguity

Finally, USLIC argues that the Members "cannot lightly toss around the word 'ambiguity' in hopes of invoking the rule that ambiguities are construed against the insurer." Dkt. 14, 12:28–13:1. Further, USLIC argues that "California law concerning interpretation of insurance contracts" precludes holding "that, because the USLIC Policy does not expressly *exclude* coverage for an award of plaintiffs' attorneys fees and costs, they must be covered." Dkt. 14, 13:18–21 (original italics). In support of its argument, USLIC states that "[i]t is virtually unanimous that an award of plaintiffs' attorneys fees as a prevailing party is an item of costs, not damages. There is no 'ambiguity.'" Dkt. 14, 13:12–13. It also cites *Hughes v. Mid-Century Ins. Co.*, 38 Cal. App. 4th 1176, 1182 (1995), as allegedly denying the argument that attorneys' fees are included unless expressly excluded. Dkt. 14, 14:3–10.

Both arguments fail. The term "damages" is precisely a word that, when not defined, is *per se* ambiguous. "Here, because the word 'damages' is not defined in the[] polic[y], and cases nationwide have differed on whether it may include attorney's fees,

1   the term in context is not clear and explicit. Therefore, we interpret the policies in favor

2   of coverage for the attorney's fees as damages." *Ins. Co. of Penn.*, 342 F. App'x at 278 (9th

3   Cir. 2009) (citation omitted). Further, *Hughes*, 38 Cal. App. 4th at 1182, does not stand

4   for USLIC's proposition. *Hughes* did not expressly concern attorneys' fees (only litigation

5   costs, of which USLIC argues fees are a part). There, the court held that the opposing

6   party's litigation costs were not covered by the Supplementary Payments provision of a

7   CGL policy because that provision only covered "costs *we* incur," and did not expressly

8   mention costs taxed against the insured. *Id.* (emphasis added). All *Hughes* announces is

9   that the Members cannot recover their attorneys' fees under the "Defense Costs"

10  provision in the Policy—an argument the Members have not advanced. *See* Policy § III.D

11  ("Defense costs includes other fees" "incurred by the Company") (bolding omitted).

12      Other case law evinces that the failure to exclude attorneys' fees from the

13  definition of "damages" is actually important. "It is reasonable to say that an attorney

14  fee award . . . is a form of 'damage' which the defendant contracted to cover. It would

15  have been simple enough to exclude attorney fee awards had the parties so intended.

16  Since they did not, and since an ambiguity remains, the ambiguity will be resolved

17  against the Insurer." *City of Pomona v. Employers' Surplus Lines Ins. Co.*, 5 Cal. Rptr.

18  2d 910, 921–22 (1992)[5] (quoting *City of Ypsilanti v. Appalachian Ins. Co.*, 547 F. Supp.

19  823, 828 (E.D. Mich. 1982), *aff'd*, 725 F.2d 682 (6th Cir. 1983)). If USLIC intended

20  to exclude coverage for attorneys' fees, it was required to expressly do so, like it did

21  for "fines, penalties, [and] taxes." Policy § III.I.

22      While the Members believe that the above case law alone belies USLIC's

23  argument that it is "virtually unanimous" that the case law supports its position, a good

24  _____

25  [5] *City of Pomona* was ordered depublished. Nevertheless, it is still citeable here as
    persuasive authority. *Renick v. Dun & Bradstreet Receivable Mgmt. Servs.*, 290 F.3d 1055,

26  1058 (9th Cir. 2002) ("Ninth Circuit Rule 36–3 . . . does not apply to unpublished
    dispositions issued by any other courts"); *Cole v. Doe 1 thru 2 Officers of City of Emeryville*

27  *Police Dep't*, 387 F. Supp. 2d 1084, 1103 n.7 (N.D. Cal. 2005) ("California Rule of Court
    [8.1115] prohibits citation or reliance by a court of an unpublished California Court of

28  Appeal decision. However, the rule is not binding in the federal courts").

means of determining the general rule is to review pertinent legal scholarship. Those sources indicate the exact opposite. The weight of the case law indicates that the recovery of attorneys' fees as damages is permissible and appropriate: "[P]olicyholders with third-party liability policies should know that the award of attorney fees to plaintiffs in an underlying action very likely is supported by the plain language of the policy. Further, the absence of an exclusion for plaintiff's attorney fees is strong evidence of the intent to cover those commonplace damages." William G. Passannante & Vivian C. Michael, *Attorney Fees and Liability Insurance: Recovering Fees Paid to Plaintiffs and Fees Incurred by Policyholders*, WESTLAW J. INS. COVERAGE, Feb. 27, 2015, at 15. "The takeaway from all of these cases is that consistent with the plain language of most D&O policies, courts generally view plaintiffs' attorneys' fees as just another type of damages. . . . [U]nless a D&O policy specifically excludes coverage for plaintiffs' attorneys' fees, such fees should be covered." Anthony P. Tatum & Shelby S. Guilbert, Jr., *Securing D&O For Attorneys' Fees in Securities Cases*, LAW360 (May 28, 2013).[6]

## 2.   Response to USLIC's Three Affirmative Arguments

As indicated by the Ninth Circuit's statement that "cases nationwide have differed on whether ['damages'] may include attorney's fees," *Ins. Co. of Penn.*, 342 F. App'x at 278, USLIC has been able to find some case law in which the term "damages" was found not to include attorneys' fees. Dkt. 14, 8:6–12:2 (citing authority). However, a close analysis of context shows that USLIC's authority is inapposite.

### 2.1.   Statutory Definitions are Inapplicable.

First, USLIC cites Cal. Civ. Proc. Code § 1033.5. Dkt. 14, 8:6–9:6. Section 1033.5 does define "Attorney's fees" as "costs" but referring to it in this context is unhelpful. As stated above, "undefined terms should be interpreted as laymen would read them, not as they might be analyzed by an attorney." *California Dairies Inc.*, 617 F. Supp. 2d at 1030 n.3. It is highly unlikely that a layman would be familiar with California procedural

---

[6] These articles are attached to the LiMandri declaration.

law generally, or § 1033.5 specifically. *See, e.g., Lunsford*, 18 F.3d at 655 (coverage for "malicious prosecution" in policy is not limited to "tort of malicious prosecution," but includes "abuse of process," because laymen, and even "lawyers and judges," do not understand what the differences are). Nor is there anything in the Policy suggesting that the parties intended to incorporate California *procedural* definitions as the *substantive* definitions in the Policy. Thus, it is simply not relevant to refer to § 1033.5.[7]

### 2.2. Cases with Disparate Factual Situations are Inapplicable.

Second, USLIC cites *Cutler-Orosi Unified Sch. Dist. v. Tulare Cty. Sch. etc. Auth.*, 31 Cal. App. 4th 617 (1994), and its progeny. Dkt. 14, 9:9–10:5, 11:1–12:2. The court in *Cutler-Orosi* stated that "an award of attorney fees, like other costs, does not compensate the plaintiff for the injury that first brought him into court; instead, the award reimburses him for a portion of the expenses he incurred in seeking relief." *Cutler-Orosi Unified Sch. Dist.*, 31 Cal. App. 4th at 632 (brackets, quotation marks, and ellipses omitted). "Attorney fees therefore are inconsistent with the concept of 'damages' as the term is used in its ordinary and popular sense, that is, compensation paid to a party for the loss or detriment suffered because of the wrongful act of another." *Id.*; *but see APL Co. Pte. v. Valley Forge Ins. Co.*, 754 F. Supp. 2d 1084, 1094 (N.D. Cal. 2010), *rev'd on other grounds*, 541 F. App'x 770 (9th Cir. 2013) (interpreting attorneys' fees as "damages" even using *Cutler-Orosi's* definition of "damages").

This rule, outlined in *Cutler-Orosi*, appears plain, but must be read in context. The case *did not* outline a bright-line rule; but rather only one that applied in its specific factual situation. *Cutler-Orosi* concerned a liability policy—not a defense policy. Thus, the insurance carrier was not obligated to provide a legal defense for the defendant there, only to pay "damages" which the defendant incurred. *Cutler-Orosi Unified Sch. Dist.*, 31

---

[7] Indeed, if one were to look to disparate legal contexts, which this Court should not do, one would find that attorneys' fees are not always legal "costs," but are sometimes "damages." *See Brandt v. Superior Court*, 37 Cal. 3d 813, 819 (1985) (breach of the covenant of good faith and fair dealing); *Prentice v. N. Am. Title Guar. Corp., Alameda Div.*, 59 Cal. 2d 618, 621 (1963) (tort of another).

Cal. App. 4th at 623. In *that* context, a plain and ordinary definition of "damages" does not include legal costs (incurred by either party). *See Golden Eagle Ins. Co.*, 99 Cal. App. 4th at 851 (explaining unique factual situation and stating: "*Cutler–Orosi* is inapposite [] because it does not concern . . . the insured's assumption of liability for the indemnitee's costs in defending against covered third party tort actions.").

Similarly, two additional cases cited by USLIC—both of which cite *Cutler-Orosi*—must be read in their specific contexts. In *Travelers*, KFx sued Arthrex for declaratory relief regarding a patent dispute. Arthrex then counterclaimed with similar patent claims, but sought only declaratory relief, not damages. KFx then tendered its counterdefense to Travelers, who denied the claim. The Ninth Circuit held that the denial was appropriate because the policy only included a duty to defend claims seeking damages. *Travelers Prop. Cas. Co. of Am. v. KFx Med. Corp.*, 637 F. App'x 989 (9th Cir. 2016). In *that* context, a plain and ordinary definition of "damages" does not include the potential liability (if one loses) of paying the opposing party's costs and attorneys' fees.

The analysis in *Health Net* is very similar. There, a health insurance provider called Health Net was sued for failing to adequately reimburse its various insureds. Health Net's multiple insurance carriers then refused to indemnify it because the claims were essentially for breach of contract, not a "wrongful act." Health Net then tried to allege that the claim for attorneys' fees was a claim for damages—the court disagreed. *Health Net, Inc.*, 206 Cal. App. 4th at 257. Again, in *that* limited context, a plain and ordinary definition of "damages" does not include the potential liability of paying the opposing party's litigation costs and attorneys' fees.

Interestingly, *APL*—cited above—rejects *Cutler-Orosi's* distinction between compensation for the act that brought the plaintiff into court, versus reimbursement for the plaintiff's efforts undertaken to achieve relief—finding both to be "remunerative payment[s]" and therefore legal "damages." *APL Co. Pte.*, 754 F. Supp. 2d at 1094. This is in line with a lay definition of "damages" which three Ninth Circuit cases have held includes attorneys' fees. *Safeway Stores, Inc.*, 64 F.3d at 1286–87; *Ins. Co. of Penn.*, 342

1  F. App'x at 278; *Nat'l Cas. Co.*, 171 F. App'x at 686. The technical reason for sometimes
2  labeling attorneys' fees to be "costs", and not "damages", is a procedural one. It arises
3  out of the fact that courts generally do not want the parties to have to prematurely prove-
4  up their attorneys' fees during trial. Rather, it makes more sense to have the prevailing
5  party handle a request for attorneys' fees as a post-trial motion once the outcome of the
6  trial is known. Using that approach, the parties' attorneys do not have to take the stand
7  or otherwise put on evidence of their fees during the trial. This could be unnecessarily
8  time consuming, and also potentially prejudicial in a jury trial.

9  ### 2.3.  Cases Interpreting CGL Policies are Inapplicable.

10  Third, and finally, USLIC cites various cases interpreting Commercial General
11  Liability (CGL) policies. Dkt. 14, 10:6–28. USLIC states that "[i]t makes no difference
12  that the subject policy is a D&O policy and not a CGL policy—the fundamental concept
13  that attorney's fees and costs are 'costs' and not 'damages' remains the same." Dkt. 14,
14  10:26–28. This is simply inaccurate. CGL policies generally provide narrower coverage
15  for lawsuits seeking monetary "damages" for "bodily injury" and "property damage."
16  In contrast, D&O policies typically do not require an allegation of monetary damages as
17  the trigger of coverage, requiring only allegations of broadly defined "Wrongful Acts."
18  D&O policies also generally cover claims for both monetary and nonmonetary relief,
19  whereas CGL policies do not. 2 H. WALTER CROSKEY, ET AL., RUTTER GRP. PRAC.
20  GUIDE: INS. LITIG. ¶¶ 7:1555, 7.1568.2, 7.1606 (2018).

21  Moreover, if one takes a step back—and looks at the policy from the insured's
22  perspective—the different types of policies make all the difference. And it is this
23  perspective which is paramount. *See Gray*, 65 Cal. 2d at 271 n.7. As part of a
24  "Supplementary Payments" provision, "[a] CGL policy obligates the insurer to pay, in
25  addition to damages and defense costs, various supplemental payments, including costs
26  taxed against the insured in any lawsuit defended by the insurer" even beyond the policy
27  limits. CROSKEY, *supra*, at ¶ 7:160 (punctuation cleaned up). In that situation, courts
28  have interpreted "attorney fees" to be "costs." *Id.* at ¶¶ 7:160.2–7:160.3.

In other words, to protect the insured, courts have taken an *expansive* approach when interpreting CGL policies, placing attorneys' fees under the costs provision that has no cap. *See, e.g., Prichard v. Liberty Mut. Ins. Co.*, 84 Cal. App. 4th 890, 912 n.22 (2000), *as modified on denial of reh'g* (Dec. 6, 2000) (determining that policy required indemnity for attorneys' fees because the CGL policy is "written so that attorney fees awarded as part of prevailing party clauses *can be* considered costs associated with the insurer's defense obligation") (emphasis omitted; italics added); *Navigators Specialty Ins. Co. v. Moorefield Constr., Inc.*, 6 Cal. App. 5th 1258, 1283 (2016) (determining that policy required indemnity for attorneys' fees as litigation costs because, even though underlying claim was ultimately not covered, that finding was not retroactive); *Ins. Co. of N. Am. v. Nat'l Am. Ins. Co.*, 37 Cal. App. 4th 195, 207 (1995) (determining that approximately $300,000 in attorneys' fees should not be placed against policy limits, but instead covered by Supplementary Payments provision).

After all, "doubts, ambiguities, and uncertainties arising out of the language used in the policy must be resolved in [the insured's] favor," *Gray*, 65 Cal. 2d at 271 n.7, and "insurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured." *MacKinnon*, 31 Cal. 4th at 648 (quotation marks omitted). And, "[i]f semantically permissible, the contract will be given such construction as will fairly achieve its manifest object of securing indemnity to the insured for the losses to which the insurance relates." *Crane v. State Farm Fire & Cas. Co.*, 5 Cal. 3d 112, 115 (1971) (en banc). Thus, attorneys' fees are "damages" in a D&O policy for the same reason that they are "costs" in a CGL policy—to protect the insured.

## CONCLUSION

For the foregoing reasons, this Court should: 1) deny USLIC's motion for partial summary judgment as to its claim for declaratory relief; 2) grant the Members' cross-motion for partial summary judgment as to USLIC's claim for declaratory relief; 3) grant the Members' motion for partial summary judgment as to their counterclaims for breach of contract and declaratory relief; and 4) let this case proceed to trial as to the Members'

1 claim against USLIC for breach of the covenant of good faith and fair dealing.

2

3                              Respectfully submitted,

4                              LiMANDRI & JONNA LLP

5

6

7 Dated: March 25, 2019          By: _____

8                              Charles S. LiMandri
                               Paul M. Jonna
9                              Jeffrey M. Trissell
10                             Attorneys for Defendants and
                               Counterclaimants A&B Market Plus, Inc.,
11                             dba Campus Liquor and Deli; LS&SLG,
                               Inc., dba Adams Avenue Liquor; Wall First
12                             Venture, Inc., dba RJ Liquor; and OB Star,
13                             Inc., dba Litickers Liquor

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28